## *In re* Ho King.

*(District Court, D. Oregon. January 15, 1883.)*

1. LABORER.

The term "laborer" is used in the treaty with China of November 17, 1880, and the act in aid thereof, of May 6, 1882, in its popular sense, and does not include any person but those whose occupation involves physical toil, and who work for wages.

2. ACTOR.

A Chinese actor or theatrical performer is not a "laborer," within the purview of said treaty or law; and such person is, therefore, entitled to come to and reside in the United States at pleasure.

3. SECTION 6 OF THE ACT OF 1882.

The certificate provided for in section 6 of the act of May 6, 1882, is not the only competent evidence that a Chinese person is not a laborer, and therefore entitled to come to and reside within the United States, but the fact may be shown by any other pertinent and convincing testimony.

*Habeas Corpus.*

*William H. Adams,* for petitioner.

*James F. Watson,* for respondent.

DEADY, D. J. This is a proceeding by *habeas corpus* to procure the deliverance of one Ho King for an alleged unlawful restraint upon his liberty. The writ issued upon the petition of Lo Wy, a subject of the Chinese empire, residing in Portland, and upon the allegation therein that King was not permitted to bring it himself, and was directed to W. Jarvis, the master of the steam-ship T. C. Hook, under whose restraint King was alleged to be. The respondent brings the body into court, and for return to the writ says that on November 25, 1882, at the port of Hong Kong, Ho King took passage on the steam-ship T. C. Hook, whereof the respondent then was and now is the master, for a voyage to Honolulu via Victoria, B. C., and Portland, Oregon; that said vessel has proceeded on said voyage as far as this port, where it arrived on January 9, 1883, with said King on board; that said King is an actor or theatrical performer by occupation or profession, and is not provided with a certificate from the Chinese government showing his right to land in the United States, as is required by section 6 of the act of May 6, 1882, "to execute certain treaty stipulations relating to China," and therefore the respondent, being advised and believing that said King was not entitled to land in the United States, and that it would be unlawful to permit him to go ashore in this port, has and does restrain him of his liberty so far as to detain him on board said steam-ship, and not otherwise. To this

return there is a demurrer filed. Upon the argument of the demurrer two questions were made:

(1) Is an actor a "laborer" within the meaning of that term as used in the Chinese treaty and act of May 6, 1882; and (2) is the certificate prescribed in section 6 of that act the only competent means of proving that a Chinese desiring to come and reside in the United States is not such a laborer.

The term "laborer" is defined by Worcester as follows: "One who labors; one regularly employed at some hard work; a workman; an operative;—often used of one who gets a livelihood at coarse manual labor, as distinguished from an artisan or professional man;" and the definition given by Webster is to the same effect. The term "laborer" is used in the supplementary treaty with China of November 17, 1880, and also of the act of May 6, 1882, by section 15 of which it is made to include "both skilled and unskilled laborers," in its popular sense, and includes only persons who perform physical labor for another for wages. It does not, therefore, include an actor any more than it does a merchant or teacher.

In the *matter of Lee Yip*, lately decided by Mr. Chief Justice GREENE, of Washington, and reported in the Seattle *Chronicle* of January 4, 1883, the learned judge, in speaking of the word "laborer," as used in this treaty and act, says:

" The term has been used in common English speech time out of mind, and in the statutes of English-speaking people from the first statute of laborers of 23 Edw. III. till to-day, to denote a comprehensive, varied, and varying class in society, rather difficult accurately to define. There is nothing in the treaty to indicate that it is used in other than that prescriptive sense. That is the sense, therefore, that should be given it both in the treaty and in the statute. This sense is a much narrower one than etymologically belongs to the word. Etymologically, a laborer is one who labors. He may labor physically or mentally, gratuitously or for reward, for himself or for another, freely or under control. However he labors he is in the broad sense a laborer. But that sense is never imputed in ordinary speech or writing, unless there is something in the context or the circumstances to imply that it is intended. * * * A laborer, in the sense of this statute and this treaty, is one that hires himself out or is hired out to do physical toil. Physical toil is essential to the definition. So, also, is a contract, express or implied, to submit for wages the person who is to do the toil to him for whom it is to be done. * * * He is not a laborer, who works with his hands in his own business, but he is one who is hired out or hires himself out to that in another's business."

Neither the treaty nor the act have in view the protection of what are called the professional or mercantile classes, or those engaged in mere mental labor, from competition with the Chinese. No grievance of this kind was ever complained of, and the language of the remedy

provided, plainly indicates that it was not contemplated by either of the parties to the treaty, or the congress that passed the act. As was said by me *In re Moncan*, 14 FED. REP. 46, the concession in the supplementary treaty was only made to allow the United States "to limit or suspend the existing right of Chinese laborers to come and be within its territory, for the purpose of laboring therein and thereby competing with the labor of its citizens for the local means of livelihood." A Chinese actor engaged in dramatic representations upon the stage of a Chinese theater seems as far removed from such competition as it is possible for a person to be.

It only remains to consider what effect is to be given to the fact alleged in the return that King has not the certificate prescribed in section 6 of the act of 1882.

In the case, *In re Low Yam Chow*, 13 FED. REP. 605, it was held by Justices FIELD and HOFFMAN that Chinese, not laborers, who at the passage of the act did not reside in China, were not required to produce this certificate to prove they were non-laborers, prior to being allowed to land.

The reasoning by which this conclusion is reached would justify the conclusion that the certificate is not absolutely necessary in any case.

The non-laboring classes of Chinese are still entitled by treaty stipulation to come to and reside in the United States, and to enjoy all the "rights, privileges, immunities and exemptions" which may be accorded to "the citizens and subjects of the most favored nation." U. S. Pub. Treat. 148; Treaty of Nov. 17, 1880; Sess. Laws, 1881-2, p. 12.

If section 6 of the act of 1882 is construed to absolutely require the production of the certificate therein provided for, before a Chinese who is not a laborer can come within the United States, then it will operate as a serious restriction upon the right and privilege given him by the treaty, because in this respect no such condition or restriction is imposed upon any subject of any other nation.

Indeed, the fact of being compelled to make proof of his condition or character at all, is a burden and inconvenience upon the Chinese coming to the United States which is not required of any other immigrant or visitor coming to this country. But probably this much is unavoidable under the circumstances, and must be submitted to as a necessary incident of the right of the United States, under the amended treaty, to exclude from the country Chinese laborers. But the treaty, (article 1,) in conceding this right, is careful to specify

that "legislation taken in regard to Chinese laborers will be of such a character only as is necessary to enforce the regulation, limitation, or suspension of immigration." It may be admitted that, taken literally, section 6 of the act of 1882 does impose this condition. But in construing a statute it is often necessary to go deeper into the matter than the mere letter. As was said *In re Moncan, supra,* "it is not to be presumed that congress, in the passage of this act, intended to trench upon the treaty of 1868, as modified by that of 1880; and therefore it is that all general or ambiguous clauses or phrases contained in the former should be construed and applied so as to make them conform to the latter. To the same effect is the ruling *In re Low Yam Chow, supra.*

Read, then, in the light of the treaty, and considered as an aid, rather than an impediment, to its enforcement, this section 6 ought to be construed as a declaration on the part of the United States that for the purpose of facilitating the entry into the country of the Chinese not within the prohibition, it will accept the certificate of the Chinese government that the bearer is not a laborer, and is *prima facie* entitled, under the treaty, to come into the United States at pleasure; but that, in the absence of such certificate, a Chinese claiming the right to enter and reside in the United States must establish the fact that he it not a laborer by evidence, as in ordinary cases of the *ex parte* proof of a fact.

But it is not to be presumed that any one will resort to this method of proof unless compelled to do so by some cogent reason or controlling emergency; for it stands to reason that it is easier for a Chinese to obtain this certificate from a friendly tribunal in his own country, where the means of proof are at hand, and the mode of procedure familiar to him, than to establish the facts contained in it by original evidence in a strange country, before officers and tribunals apt to regard him with suspicion and disfavor.

Upon this point, Chief Justice GREENE has reached a similar conclusion. In the case of *Lee Yip, supra,* he says:

" Congress did not construct their law in order to annul, override, or in any degree abate aught granted in the treaty. They provided certificates for the benefit and security of the privileged classes. Non-production of a certificate is a circumstance which, if alone and unexplained, may properly be regarded as proof that the person lacking it is one who is prohibited. But its non-production is open to explanation, and the presumption arising from its non-production to contradiction. Whenever the question of a right under the treaty comes before the court, evidence may be heard to establish the right."

In this case the fact that King belongs to the privileged class is established in the judgment of the court by the admission that he is an·actor, of which there is not a particle of doubt. The non-production of the certificate is also satisfactorily explained by the fact stated in the return, that he did not leave China with the intention to come to the United States, but to go to Honolulu, but for some reason, having been brought here by the respondent before being taken to Honolulu, he prefers to remain here for the present, at least, as he has a perfect right to do, if he is one of the privileged class.

The order of the court is that Ho King is discharged from the restraint imposed by the defendant and allowed his liberty, and that the petitioner recover costs.